**NATIONAL LABOR RELATIONS
BOARD**

v.

**SAWYER DOWNTOWN MOTORS, Inc.**

No. 11066.

United States Court of Appeals
Seventh Circuit.

May 28, 1954.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Fannie M. Boyls, Wiley M. Craft, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

Charles Geisenfeld, Geisenfeld & Geisenfeld, Milwaukee, Wis., for respondent.

Before MAJOR, Chief Judge, and LINDLEY and SCHNACKENBERG, Circuit Judges.

MAJOR, Chief Judge.

Petitioner requests enforcement of its order, issued April 10, 1953, against respondent, following the usual proceedings under § 10 of the National Labor Relations Act, Title 29 U.S.C.A. § 160. The Board's decision and order are reported in 103 NLRB No. 120. The Board found that respondent had interfered with, restrained and coerced its employees in the exercise of their organizational rights, in violation of § 8 (a) (1) of the Act, and also that respondent discharged William Sprotte and Richard Stahl, two of its employees, because of their membership in and activities on behalf of the Amalgamated Clothing Workers of America (herein called the Union), in violation of § 8 (a) (1) and (3) of the Act. The sole issue here arises from respondent's challenge to the propriety of the order, predicated upon the contention that the findings of the Board upon which its order rests are not substantially supported by the evidence.

Respondent, Sawyer Downtown Motors, Inc., is a Wisconsin corporation engaged in the sale of Buick automobiles under a franchise from the Buick Motor Division, General Motors Corporation. It maintains offices and a salesroom in Milwaukee, where the unfair labor practices as alleged and found took place. There is no question but that respondent's activities affected commerce within the meaning of the Act.

Inasmuch as the sole issue here is factual, we start with the statutory provision contained in § 10(e) of the Act, which provides: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." We have examined the record and while the evidence relied upon by the Board is not voluminous and in some respects not as satisfactory as we would like, yet we are satisfied that it furnishes sufficient support to the challenged findings. It is the function of the Board as the trier of the facts, and not that of a reviewing court, to reconcile the conflicting testimony and to determine the credit or weight to be attached to the testimony of the various witnesses.

A brief statement of the evidence upon which the Board relies will suffice. Walter J. Sawyer was respondent's president, Frank Kasper its sales manager and Chester Van Vleet its used car manager. Prior to December, 1951, respondent's employees were unorganized. During the latter part of that month a movement was initiated to organize and to induce respondent's employees to join the Union. During this organizational movement there is testimony that Kasper stated to employee Anderson, " * * * don't affiliate yourself with that kind of monkey business in any manner, because Mr. Sawyer just won't stand for it, and as much as I like you, I'll have to give you the axe." Kasper frequently inquired of Anderson whether he had joined the Union, was attending its meetings and if the Union was bothering him. On one occasion, Anderson informed Kasper that he had signed a card. A few days later Sawyer inquired of Anderson if he was "in that Union," urged him to vote with respondent and promised that respondent would rectify any matters about which Anderson thought he was "being cheated." Anderson was called into Kasper's office and asked to sign a paper requesting removal of his name from the rolls of the Union. After the discharge of Stahl, Anderson was also requested by Kasper to sign a paper which contained a statement reflecting upon Stahl's work and that he had not been discharged "because of any Union." Anderson signed these papers, so he testified, under duress. On January 25, 1952, immediately after the discharge of Sprotte and prior to the discharge of Stahl, the latter was called into Kasper's office and, upon inquiry, told Kasper that he was a member of the Union. Kasper stated, "Don't you want to work here any more? * * * Why did you get yourself tied up with the Union?" On the same occasion, Kasper pointed out that the Union might be all right for a laboring class of people but that in a sales organization "it is only a lazy skunk who doesn't want to work."

Sprotte was an outstanding salesman and had worked for respondent since November 16, 1950, in both the old and new car departments; in fact, his work was so satisfactory that Kasper had spoken to him about the possibility of his being promoted to the position of assistant sales manager. He was an early convert to the Union's organizational movement, attended its meetings, discussed unionization with the other salesmen and, when the Union was informally organized January 21, 1952, became a temporary vice president. Sprotte's activities in connection with the Union were known to respondent. About four days after Sprotte had been elected temporary vice president of the Union he was called into Kasper's office and summarily discharged. On that occasion Kasper said to him, "Bill, I'm afraid I will have to let you go. * * * I can't explain, I get my orders you know and I have to obey them." Stahl became interested in the Union, attended organizational meetings and talked to the other salesmen concerning the Union. On January 21, he signed a membership card and on January 28 (three days after the discharge of Sprotte), he was discharged. The reason given by Kasper at that time was that Stahl's sales were not what they should be. Stahl accused Kasper of discharging him because of

his Union activities, to which Kasper replied, "You know there is nothing I can do about it. I have my orders. I have to fill them or I won't have a job."

■■■ Respondent does not challenge these statements charged to its officials but contends they were merely the expression of opinion as permitted by § 8(c) of the Act of 1947. We agree with the Board that they go far beyond that which is permissible. A similar contention was made and rejected by this court in National Labor Relations Board v. Kropp Forge Co., 7 Cir., 178 F.2d 822, 827. What was there stated on this point is equally applicable here and need not be repeated. It is hardly open to question but that this testimony sustains the Board's finding and conclusion that respondent violated § 8(a) (1) of the Act.

Relative to its contention that the discharges of Sprotte and Stahl were non-discriminatory, respondent attempted to show that they were for a reason other than the Union activities of the two men. The reason assigned was that while Sawyer was in New York attending the Automobile Dealers' Association in the latter part of January, 1952, he learned of the plans of the Buick Motor Company to reduce the quota of cars available to its distributors by 25%. He immediately decided to cut respondent's overhead and sent an airmail letter to Kasper, directing that Sprotte, Stahl and a salesman named Buettner be discharged. We agree, of course, with respondent's argument that the reason now assigned by it for the discharge of the two men was non-discriminatory. It had a right to discharge these employees or any others for any reason or no reason, other than their membership in or activities in connection with the Union. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893. The Board, however, refused to credit respondent's reason for the discharge of the two men, and we think it was justified in so doing. In fact, this reason advanced at the hearing for the first time appears to have been an afterthought; at any rate, no such reason was given to either Sprotte or Stahl at the time of their discharge. If the reason respondent now assigns was real, it is hardly reasonable to believe that these employees would have been abruptly discharged; they would in all probability have been temporarily laid off, subject to recall when and if business improved. And quite significant in this connection is the fact that within a short time respondent had employed new salesmen to take the place of those who had been discharged. It may be that respondent had a valid reason for the discharge of these two men, and particularly Stahl who the evidence shows was a less efficient salesman than Sprotte, but even so, we are satisfied that the evidence supports the Board's finding that the discharges were discriminatory.

Respondent also complains, without merit we think, that the Board denied its motion of June 26, 1953, to reopen the proceeding so that respondent might offer testimony designed to show that the projected plans of the Buick Company to reduce its car output by 25% did in fact become a reality. Respondent requests that this court remand the case to the Board, with directions that it hear additional evidence on this point. Like the Board, we think this proffered testimony is immaterial. At any rate, it is not discernible how proof of a situation which developed subsequent to the discharges could be relied upon as the reason therefor. More specifically, it is not material whether the proposed reduction in cars materialized. The essential question is whether Sawyer acted upon the report in good faith and that it was the reason for the discharges. As already shown, we think that the contrary finding of the Board is substantially supported. The request that the case be remanded to the Board for the purpose of hearing additional testimony is, therefore, denied.

The petition for enforcement is allowed, and an appropriate order may be submitted.